## Wyly v. Kallenbach et al.

(Decided Sept. 28, 1934.)

B. L. SHAMBURGER for appellant.

DAVID R. CASTLEMAN and GEORGE C. BURTON for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing on original and affirming on cross appeal.

From a judgment awarding her but $916.63 as her share of the rents and profits of a certain ice plant, Bessie Wyly has appealed, and Shelburn Wyly Kallenbach and Enos B. Wyly have prosecuted a cross-appeal from so much of the judgment as allows her anything in excess of $300.

### The Facts.

On May 15, 1933, Sam S. Wyly died intestate. He owned other property, but all that is involved here is an operating ice plant known as "Fort Hill Ice Co." He was survived by his widow Bessie Wyly and four children, to whom his property passed under our Statutes. Bessie Wyly was his second wife, and had borne him no children. All are sui juris.

The parties realized it would be best to sell this property for partition; that an immediate sale could not be had; that it would be best to continue the operation of the plant, and hence on May 23, 1933, agreed and contracted that the Liberty Bank & Trust Company, the administrator, should operate the plant and keep the funds derived from its operation in a separate account.

As to the ice plant itself the parties agreed, on November 1, 1933, that it was real estate, it was worth $20,000, the widow was 35 years of age, the value of her dower right computed at 5 per cent. under the life tables was 21.63 per cent., and she was then assigned her dower therein in cash, viz. $4,326.

## The Fund in Controversy.

The contract for the operation of the ice plant by the administrator then came to an end, and it is agreed that the gross income from the plant during the 5½ months it was operated by the administrator is $17,-274.15; that the expenses of that operation when deducted leaves a net sum of $6,381.68, upon the division of which the parties were unable to agree, and this litigation resulted.

## The Contention.

No one can state the contention of these parties better than was done. by the chancellor in his opinion. wherein he says:

"The widow contends the word 'profits' in the phrase 'rents and profits' contained in section 2138, Ky. Stats., means just what it says, to wit 'profits.' The heirs, on the contrary, claim the words 'rents. and profits' mean the reasonable rental value of the intestate's realty."

The judgment is based upon what that court found was the reasonable rental value of the property.

## The Statute.

Sec. 2138. "The wife shall be entitled to one-third of the rents and profits of her husband's dowable real estate from his death until dower is assigned, and she shall hold the mansion house, yard, garden, the stable and lot in which it stands, and an orchard, if there is one adjoining any of the prem-

ises aforesaid, without charge therefor, until dower is assigned her.''

## Its Meaning.

We can best arrive at the meaning of this statute by looking briefly at the history leading up to it.

Before Magna Carta no amount of forethought of a Crown tenant could rescue his widow from the unfortunate position into which his death would plunge her. She might find herself in actual destitution, until she had made her bargain with the Crown. To remedy that it was in Magna Carta provided she should have her rights without delay, without difficulty, and without payment, and she was then given her quarantine; that is, the right to remain in the mansion house for 40 days as pointed out in Morton v. Morton, 112 Ky. 706, 66 S. W. 641, 23 Ky. Law Rep. 2079. A widow needed more than a roof, and as she could claim no portion of the produce of her husband's manors, as strictly her own, until dower was assigned her, she might find herself hungry, and accordingly when the charter was reissued in 1217 there was added words entitling her to *rationabile estoverium suum interim de communi*, which was construed to mean she was entitled to take from the common property of herself and the heir reasonable sustenance of every kind, including the right to kill such oxen on the manor as she required for food. See Coke's Second Institute, p. 17.

Thus even in that early day there were two provisions made for a widow, estovers and quarantine for her immediate needs, and dower for her future support.

The propriety of making a two-phased provision for a widow has been recognized for more than 700 years, and we find it reflected in our Statutes wherein she is given for her future support, by section 2132, Ky. Stats., one-third for life of all the real estate of which her husband was seized, in fee simple during her coverture, and one-half of the surplus personal property left by her husband.

For her immediate needs she is given the following which she takes to the exclusion of both her husband's heirs and his creditors, to wit: By section 1403, subd. 5, she or she and the infant children, if any, are given out of the surplus personal property on hand or in bank $750 (this in lieu of her common-law estovers); and by

section 2138 she is given (*this is called her "quaran-tine" from the French word "quarantaine," meaning a period of 40 days; French was, when Magna Carta was written, the court language of England*) one-third of the rents and profits of her husband's dowable real estate, until dower is assigned her, and these she takes, no matter what her husband's debts may be, indeed she takes these even against a vendor's lien upon the same land from which she takes them (Wilson v. Ewing, 79 Ky. 549), or a mortgage upon the land in which she had joined with her husband (Mayfield v. Wright, 107 Ky. 533, 54 S. W. 864, 21 Ky. Law Rep. 1255). See 24 C. J. p. 235, sec. 767 et seq.; 9 R. C. L. p. 611, sec. 52; Washburn on Real Property (5th Ed.) p. 281, sec, 222; Thompson on Real Property, sec. 851; Tiffany on Real Property, sec. 232, p. 807; Scribner on Dower, ch. 1, sec. 15 et seq.; Schouler on Ex'rs and Adm'rs (6th Ed.) sec. 2689 et seq.; Dembitz on Land Titles, vol. 2, sec. 110, p. 842; Dembitz's Ky. Jurisprudence, Quarantine and Back Rents, p. 325; 9 Kentucky Digest, Executors and Administrators.

Thus by Magna Carta the widow was given right to dower and quarantine, but no provision was made im-posing a penalty for withholding either. What after-wards came to be called the English Parliament met at Merton in Surrey in 1235 during the reign of Henry III, and provided that damages could be recovered of one deforcing a widow of her dower. See Reeves, English Law, vol. 1, p. 261. This is the statute of Merton re-ferred to in Golden v. Maupin, 2 J. J. Marsh. (25 Ky.) 236.

Section 2138 is the only one of these statutes with which we are now concerned. The earliest trace we find of this statute in America is in an act of the General Assembly of Virginia passed at a session begun at Wil-liamsburg October 23, 1705, in which, by section 8 of chapter 7, it is provided:

"And be it further enacted, that the widow of any person dying intestate shall be endowed of one full and equal third part of all her deceased husband's Lands, tenements, and other real estate, in manner as is directed and prescribed by the laws and con-stitutions of the Kingdom of England; and till such dower shall be assigned it shall be lawful for her to remain and continue in the mansion house, and the

messuage or plantation thereto belonging, without being chargeable to pay the heir any rent for the same, any law, custom, or usage, to the contrary, in any wise notwithstanding.''

This continued to be the law of Virginia, and omitting the reference to the Kingdom of England it so appears in a compilation of the laws of Virginia made in 1792.

By an act in this state approved December 19, 1796, a widow was given the right to use and occupy her husband's mansion house and plantation rent free until dower was assigned her. See copy of this act in Morton v. Morton, 112 Ky. 706, 66 S. W. 641, 23 Ky. Law Rep. 2079, where it is erroneously referred to as the statute of 1797.

In Coons v. Nall's Heirs, 4 Litt. (14 Ky.) 263, Mrs. Nall had in her lifetime filed suit against the occupant of her husband's land for her dower. While the suit was pending she died. Without the appointment of an administrator for her, the children sued the occupant for the rents and profits of the land of which they allege their mother was dowable. In holding the heirs could not maintain the suit the court said

''We are aware, that cases are to be found, where courts of equity have decreed an account of the rents and profits of land, of which a widow was dowable, though her right to dower was not established in her lifetime; but in no case has the decree been made in favor of the heir of the widow. The demand for rents and profits is, in its nature, personal, and wherever it is recoverable, the recovery must be by the representative of the personal estate, and not by the heir.''

In Chaplin v. Simmons' Heirs, 7 T. B. Mon. (23 Ky.) 337, the widow of Richard Simmons continued to occupy his mansion house and plantation. She married James Chaplin and they continued to occupy it. After her death, the children sued Chaplin for the rent of the plantation while their mother (his wife) and he had the use of it. The court held their mother had been entitled to such occupation and denied to them the right to recover rents.

In Stewart's Lessee v. Stewart, 3 J. J. Marsh. (26 Ky.) 48, Thomas Stewart had conveyed to R. Stewart

a certain lot in Louisville, which R. Stewart afterwards leased to the plaintiff. After death of Thomas Stewart, the lessee sued the widow to recover possession of the lot. The court held this lessee was entitled to the possession of no part of this lot until dower was assigned to the widow. In the opinion it is said:

> "A widow is entitled to the mansion house and plantation, until dower assigned. I. Dig. 444. A town lot, including the mansion house, should go to her, as a plantation would in the country, until the assignment of dower."

In Stevens' Heirs v. Stevens, 3 Dana (33 Ky.) 371, the question was not the widow's quarantine but her dower, so it is of but little help to us, and the same is true of Smith's Heirs v. Smith, 5 Dana (35 Ky.) 179.

Widows were favorably regarded by the court under this statute. See Graham's Heirs v. Graham, 6 T. B. Mon. (22 Ky.) 561, 17 Am. Dec. 166.

### Change in the Statute.

By section 9, art. 4, c. 1, of act approved March 24, 1851, this statute was changed so as to read thus:

> "The wife shall be entitled to one third of the rents and profits of her husband's dowable real estate, from his death until dower is assigned; and she shall hold the manison house and curtilage without charge therefor, until dower is assigned to her out of the estate devised or descended."

It so remained until the enactment of the General Statutes, wherein it took this form:

> "The wife shall be entitled to one third of the rents and profits of her husband's dowable real estate, from his death until dower is assigned; and she shall hold the mansion house, yard, garden, the stable and lot in which it stands, and an orchard, if there is one adjoining any of the premises aforesaid, without charge therefor, until dower is assigned to her." See Gen. St. 1883, c. 52, art. 4, sec. 8, p. 530.

It so remained until the Acts of 1891-92-93, c. 205, sec. 47, when it took the form it now has, so we may say this statute has had practically its present form since 1851. Certainly the expression "Rents and Profits" has been in it since 1851.

The word "profits" had not appeared in the previous statute; it first appeared in 1851. Previously the word "rent" alone had appeared in the statute and widows had been getting their rent, so why add the word "profits" if it be not the intention of the Legislature to give to the widow something more than the rent. We are compelled to believe the Legislature had some purpose in adding to the word "rent" which had been used in the previous statute. This court had then recently decided the case of Stevens' Heirs v. Stevens, 3 Dana (33 Ky.) 373, wherein it was held that a widow's dower attached to a ferry and that she was entitled to one-third of its profits. The case of Smith's Heirs v. Smith, 5 Dana (35 Ky.) 179, was also recent, in which this court had said:

> "Regard should be had not only to the value of the estate, but also to the annual productiveness of the several parcels, and equal justice, in both respects, done to the widow and the heirs, as near as may be. And if this cannot be accomplished by assigning a separate and distinct parcel to the widow, including the mansion house, then should a certain interest in the mills be assigned her, as a third, fourth, fifth or sixth, so as to make her third not only equal in value as to soil, but, in annual issues or profits, to one-third, as near as may be reasonably accomplished."

The Legislature in rewriting the laws relative to the widow's quarantine was endeavoring to harmonize it with the law relative to dower as the court had construed it, and the word "profits" was inserted for the express purpose of giving her one-third of these profits as a part of her quarantine.

The case of Cain's Adm'r v. Kentucky & Ind. Bridge Co., 124 Ky. 449, 99 S. W. 297, 30 Ky. Law Rep. 593, is of little aid. Redmond v. Redmond's Adm'x, 91 S. W. 260, 28 Ky. Law Rep. 1176, is a little better but not much; it merely shows the widow is entitled to her one third of the gross rents. Neither is Phillips v. Williams, 130 Ky. 773, 113 S. W. 908 of much help or Bogie v. Nelson, 153 Ky. 440, 155 S. W. 1142. All of these cases deal with the question of a widow's dower rather than her quarantine. In Russell's Adm'r v. Russell's Heirs, 1 Ky. Op. 95, the court held the widow was entitled to the whole of certain rents ($170.10), as her quarantine, and not to one-third thereof as her dower.

A case directly in point is Crain, Guardian, v. West, 191 Ky. 1, 229 S. W. 51. In it the question was: To what part of the royalties from a producing well is a widow, to whom dower has not been assigned, entitled? The court's answer was: "One-third." The royalty was treated as a profit and it was adjudged to the widow as her quarantine, though that particular word was not used. It could not be adjudged to her as her dower, for dower had not been assigned to her and the proceeding was not one for the assignment of dower. To same effect, see Bartlett's Adm'r v. Buckner's Adm'r, 245 Ky. 645, 54 S. W. (2d) 25.

The case of Lemaster v. Hudson, 214 Ky. 467, 283 S. W. 439 is directly in point, in fact is on all fours with this one, for there as here the widow, before an assignment of dower, had joined with the heirs in the execution of an oil lease from which royalties were obtained, which were adjudged to be profits of which the widow was entitled to one-third under section 2138, though the writer of that opinion did not know his lesson then, so well as now, and he scrambled around and called the widow's quarantine her dower; still he reached a sound conclusion. This was followed by a case to same effect in Collins v. Lemaster, 232 Ky. 188, 22 S. W. (2d) 567. See, also, Williamson v. Williamson, 223 Ky. 589, 4 S. W. (2d) 392. Another case in point is Trimble v. Ky. River Coal Corp., 235 Ky. 301, 31 S. W. (2d) 367 and again the writer of the opinion speaks of a widow's dower, when he should have spoken of her quarantine; but he reached the right result.

The case of Jones v. Jones, 11 Ky. Op. 412, is quite instructive. The widow had taken charge of everything. She cultivated a portion of it, and pastured the remainder, from which pasturing by her own stock and by others she got a profit. The court held she was entitled to the mansion house, yard, garden, etc., but reversed the judgment because she had been charged with 10/21 of the rent of the entire farm.

Sec. 2138 Ky. Stats. means just what it says. If the premises are rented the widow gets one-third of the rent; if she uses the whole of it she must account for two-thirds of the rent of all of it except the mansion house, yard, and garden, etc.; and if by agreement with the heir the premises be used in some other way, as was done in this case, and a profit is made, she is entitled to one-third of that profit.

Widows' quarantine statutes are enacted for a twofold purpose: (a) To serve as a means of supplying the widow's immediate needs, and (b) to serve as a whip to compel the heir to bestir himself and arrange that her dower be assigned her at the earliest possible moment.

### Upkeep and Expenses.

We are not going to allow Mrs. Wyly one-third of $17,274.15, for which she asked judgment in her amended answer.

· We have not overlooked the rule that a widow's quarantine is ordinarily estimated upon the gross rents and profits, and that the expense of maintaining and preserving the estate must be borne by the heir. See 24 C. J. p. 235, sec. 767; Morton v. Morton, 112 Ky. 706, 66 S. W. 641, 23 Ky. Law Rep. 2079; and Redmond v. Redmond's Adm'x, 91 S. W. 260, 28 Ky. Law Rep. 1176.

That means the heir must pay the ordinary expense of maintaining and using the estate in the ordinary way, but when the widow and the heirs agree upon an extraordinary use of the estate by means of which extraordinary rents or profits are received, then only the ordinary expenses of maintaining and preserving the estate must be borne exclusively by the heir, in this case that would mean such expenses as taxes, insurance, and water rent, or other charges that would have accrued if this plant had not been operated, but the extraordinary expenses such as pay rolls, water and power used in operation, insurance premiums paid to carry workmen's compensation insurance, and other like expenses, resulting entirely from the extraordinary use made of the property, must be paid from the gross receipts and the widow gets her quarantine from and estimated upon the net profits then remaining.

### Collateral Operations.

Upon this property there was an oil and gas service station, which the intestate Sam S. Wyly had operated, and it was operated by the Administrator along with the ice plant, and its profits are commingled with the profits of the ice plant, and also ice was bought at wholesale and added to the production of the plant and the profits therefrom commingled with the profits of the ice plant; but all this was one operation all conducted on the dowable realty with the full knowledge, consent, and

approval of all concerned, and all these profits are to be treated alike, and upon the net profit of all these operations the widow's quarantine is to be estimated, and from it to be paid.

The parties here agree a net profit of $6,381.68 was made from this property and before the widow's dower had been assigned to her, and as the trial court should have given her one-third of that, and because the trial court based the judgment upon what he found was the reasonable rental value of the property, this judgment must be reversed on the original and affirmed on the cross appeal.

The whole court sitting.